UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NARRAGANSETT INDIAN TRIBE, : <br> ACTING BY AND THROUGH THE : <br> NARRAGANSETT INDIAN TRIBAL : <br> HISTORIC PRESERVATION OFFICE, : <br>  : <br> Plaintiff, : <br>  : <br> v. : <br>  : <br> NICOLE R. NASON in her : <br> official capacity as Deputy Administrator of : <br> the FEDERAL HIGHWAY : <br> ADMINISTRATION, : <br>  : <br> Defendant. : | Civil Action No.: 20-576 (RC) <br><br> Re Document No.: 12 |

**MEMORANDUM OPINION**

DENYING DEFENDANT'S MOTION TO DISMISS

**I.  INTRODUCTION**

In this case, the Narragansett Indian Tribe (the "Tribe"), acting through the Narragansett Indian Tribal Historic Preservation Office ("NITHPO"), challenges administrative action taken by the Federal Highway Association ("FHWA") with respect to a highway project in Rhode Island.  The National Historic Preservation Act ("NHPA"), codified at 54 U.S.C. §§300101 *et seq*, requires that federal agencies "take into account" the preservation of historic sites when implementing federal projects.  NITHPO argues that the termination of a programmatic agreement formed pursuant to NHPA and federal regulations—an agreement formed between FHWA, NITHPO, and Rhode Island state agencies that, by regulation, can fulfill the statutory requirements of NHPA—constitutes arbitrary and capricious agency action under the Administrative Procedure Act ("APA").  Defendant moves to dismiss this case, arguing that

NITHPO has failed to plead sufficient facts to state a valid claim.  Because the Court finds that Plaintiff has alleged sufficient facts to state a claim under the APA, and for the reasons set forth below, the Court denies Defendant's motion and will await motions for summary judgment with citations to the full administrative record.

## II.  BACKGROUND

### A.  Statutory and Regulatory Framework

The NHPA requires that any federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . prior to the approval of the expenditure of any Federal funds on the undertaking . . . shall take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108.  This requirement is often referred to as the "Section 106" process.  The Advisory Council on Historic Preservation ("ACHP") is the agency responsible for issuing regulations that implement the Section 106 process.  36 C.F.R. § 800.2(b).  Regulations codified at 36 C.F.R. § 800 *et seq* lay out the steps an agency must take to comply with NHPA's requirement to "take into account the effect of the undertaking on any historic property."  "The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning."  36 C.F.R. § 800.1(a).  Subpart B of this chapter of the Code of Federal Regulations lays out in detail the normal Section 106 process.  *See* 36 C.F.R. §§ 800.3–800.13.  Subpart C discusses program alternatives.  *See* 36 C.F.R. §§ 800.14–800.16.

One type of program alternative to the Section 106 process is the development of programmatic agreements.  *See* 36 C.F.R. § 800.14(b).  Programmatic agreements "govern the

implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id.* Before implementing a programmatic agreement, the federal agency must consult with the appropriate stake holders, including state historical preservation offices and Indian tribes. *Id.* § 800.14(b)(2)(i). Programmatic agreements take effect when executed by the stakeholders. *Id.* § 800.14(b)(2)(iii). "Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings . . . covered by the agreement." *Id.* The regulations state that if the ACHP "determines that the terms of a programmatic agreement are not being carried out, or if such an agreement is terminated, the agency official shall comply with subpart B of this part" with respect to the undertaking covered by the agreement. *Id.* § 800.14(b)(2)(v). An approved programmatic agreement satisfies an agency's Section 106 responsibilities "until it expires or is terminated by the agency . . . or the [ACHP]." *Id.* § 800.14(b)(2)(iii).

Because federal regulations state that compliance with programmatic agreements fulfills an agency's Section 106 responsibilities, courts analyze programmatic agreements to determine whether agency action is compliant with their terms. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 847 (10th Cir. 2019) (stating that the issue to resolve is whether agency violated requirements of a programmatic agreement); *Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV-1402504 JAK (SPx), 2015 WL 12661945, at *13 (C.D. Cal. June 11, 2015) (explaining that obligations under a programmatic agreement serve as a substitute to compliance with Section 106). Holding an agency to the terms of a programmatic agreement follows from the regulatory language; if "[c]ompliance with the procedures established by an

approved programmatic agreement" can satisfy an agency's Section 106 obligations, 36 C.F.R. § 800.14(b)(2)(iii), noncompliance with the terms would not satisfy those obligations.

More generally, Section 106 does not dictate substantive results. Instead, Section 106 is a procedural statute requiring a federal agency to take certain steps prior to beginning a project. *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003) ("An essentially procedural statute, section 106 imposes no substantive standards on agencies, but it does require them to solicit the [ACHP's] comments and to take into account the effect of [their] undertakings.") (internal quotations and citations omitted).

### B. Procedural History

As pled in the Complaint, FHWA has provided substantial funding for the replacement of the I-95 Providence Viaduct Bridge. Compl. ¶ 12, ECF No. 1. In the initial planning phases of the project, FHWA determined that the bridge replacement "would result in adverse effects on the Providence Covelands Archaeological District." *Id.* ¶ 15. To address the adverse effects, FHWA developed a programmatic agreement in consultation with NITHPO, the Rhode Island State Historic Preservation Office ("RISHPO"), and the Rhode Island Department of Transportation ("RIDOT"). *Id.* ¶ 17.

The programmatic agreement required "FHWA in coordination with RIDOT" to acquire and transfer ownership of three parcels of land to the Tribe. *Id.* ¶ 21. The parcels, as identified in the Complaint, are the Salt Pond Archaeological Preserve, the so-called "Providence Boys Club – Camp Davis" property, and the so-called "Chief Sachem Night Hawk" property. *Id.* The three parcels of land "have inherently historic, cultural, and religious significance to the Tribe." *Id.* ¶ 26. The transfer of ownership was meant to mitigate the negative effects of the highway project. *See id.* ¶¶ 15–19.

Construction began on the highway project in June 2013, but ownership of the properties had not yet been transferred to the Tribe. *Id.* ¶ 29. At this point, the parties to the programmatic agreement reached an impasse. RIDOT refused to transfer title of the Providence Boys Club – Camp Davis and Chief Sachem Night Hawk properties to the Tribe unless the Tribe specifically waived sovereign immunity with respect to those properties. *Id.* ¶ 30. But the programmatic agreement contained no provision requiring the waiver of sovereign immunity. *Id.* ¶ 31. The Tribe thus refused to agree to the condition and RIDOT refused to transfer the properties absent a waiver. Confronted with this impasse, FHWA sought to terminate the programmatic agreement even though construction on the southbound lane had already been completed and opened to traffic. *Id.* ¶¶ 32, 35.

The ACHP issued comments on the proposed termination of the programmatic agreement on May 3, 2017. *Id.* ¶ 36. The ACHP stated that the project should not be delayed, that the Salt Pond Archaeological Preserve should be preserved under the terms of the original programmatic agreement, and that the other two parcels should be transferred to the Tribe without a waiver of sovereign immunity. *Id.* ¶ 38. After receiving ACHP's comments and taking them into consideration, FHWA determined it would reinitiate the normal Section 106 consultation process and draft a new programmatic agreement. *Id.* ¶ 39. FHWA outlined new mitigation items to address the adverse effects of the project, including that in lieu of the land transfers of the Providence Boys Club – Camp Davis and Chief Sachem Night Hawk properties, the programmatic agreement would implement an academic-level historic context document about the Tribe, Section 106 training for the Tribe, a video documentary about the Tribe, and a teaching curriculum for Rhode Island public schools about the Tribe. *Id.* ¶ 40. NITHPO claims

that terminating the original programmatic agreement and "dictating new proposed mitigation items—items that the Tribe was never consulted about—is arbitrary and capricious." *Id.* ¶ 49.

This is not the first lawsuit the Tribe has filed regarding the Viaduct Bridge project and the impasse reached between the parties. In 2017 and 2018, the District of Rhode Island and the First Circuit Court of Appeals ruled on a lawsuit brought by the Tribe alleging breach-of-contract claims stemming from RIDOT's refusal to transfer the properties. *Narragansett Indian Tribe, by and through the Narragansett Indian Tribal Historic Pres. Office v. Rhode Island Dep't of Transp.*, No. 17-cv-125, 2017 WL 4011149, at *2 (D.R.I. Sept. 11, 2017), *aff'd*, 903 F.3d 26 (1st Cir. 2018). The district court dismissed the claims against the federal defendants because the Complaint was "devoid of any assertion that Federal Defendants' final agency action caused Plaintiff harm." *Id.* at *3. The court reasoned that the Tribe's claims were generally premised on RIDOT's refusal to transfer the land, not any action taken by FHWA, and therefore the court lacked subject-matter jurisdiction with respect to the claims against the federal agency. *Id.* On appeal, the Tribe argued that the NHPA creates a private cause of action that encompassed the claims against FHWA. 903 F.3d at 29. The First Circuit, assuming without deciding that the NHPA does create a private cause of action, held that the Tribe failed to allege a violation of the NHPA by the federal defendants. *Id.* at 30. Instead, the court saw the complaint as an attempt to compel "the federal defendants to participate as parties in a suit . . . arising out of RIDOT's alleged breach of contract." *Id.* The court affirmed the dismissal and noted that "[n]othing in the regulations requires a federal agency to enter into [a programmatic agreement]. And nothing in the regulations prevents the agency from terminating such an agreement." *Id.* The court passed on the question of whether the APA's waiver of sovereign immunity would allow a court to review final agency action in this case. *See id.* at 29.

### III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

## IV.  ANALYSIS

Under the APA, a plaintiff challenging agency action can prevail if a court finds that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  This standard of review encourages courts to defer to the agency's expertise.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *State Farm*, 463 U.S. at 43).  Rather than resolving factual issues, the district court's role in reviewing agency action "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Bates v. Donley*, 935 F. Supp. 2d 14, 22-23 (D.D.C. 2013) (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).  To state a proper claim under the APA, a plaintiff must allege facts that, if true, plausibly establish that the agency action is arbitrary and capricious.  *See James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 284 (D.C. Cir. 2000); *Akpan v. Cissna*, 288 F. Supp. 3d 155, 165 (D.D.C. 2018); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp 3d 38, 78 (D.D.C. 2015).

Defendant argues that APA review is highly deferential, that NITHPO's disagreement with the agency reasoning is not sufficient to support a valid claim, and that the "NHPA does not require federal agencies to enter into programmatic agreements, nor prevents agencies from terminating such agreements." Def.'s Mot. Dismiss ("Def.'s Mot.") at 9, ECF No. 12.

Defendant points out that the NHPA only requires that an agency follow certain procedural steps and does not dictate substantive results; Defendant states that NITHPO's complaint fails to allege any failure to act in accordance with the procedures laid out in the NHPA. *Id.* 9–10. NITHPO argues that APA review may be deferential, but the standard is applicable only when a court has the entire administrative record presented for review. Pl.'s Opp'n Mot. Dismiss at 8, ECF No. 18. NITHPO states that, in light of liberal pleading standards, it has alleged sufficient facts to support a claim under the APA. *Id.* at 8–9. The Complaint, according to NITHPO, establishes that the project has "resulted in destruction of historic lands," that the part of the project "has been completed without adverse effects being addressed," and that "the termination of the [programmatic agreement] resulted in a complete failure to address and mitigate the adverse effects" of the project. *Id.* at 9.

The Court finds that NITHPO has alleged sufficient facts to survive a motion to dismiss. Defendant's arguments about the highly deferential review of agency action under the APA, while correct, are premature given that the Court does not have the administrative record or, more importantly, the programmatic agreement at the heart of this dispute. While Defendant is also correct that the regulations specifically contemplate termination of programmatic agreements, and, thus, a termination is unlikely to violate the APA as being contrary to law, it does not follow that termination will always be appropriate and cannot be considered violative of the APA as arbitrary and capricious. That termination is specifically contemplated by regulations does not necessarily insulate such termination from judicial review.[1] Defendant's arguments, rather than pointing to any failure to meet pleading standards, go to the merits of

---

[1] Defendant originally argued that the Complaint should be dismissed because there had not yet been final agency action. *See* Def.'s Mot. at 7–8. Defendant has since withdrawn this argument. *See* Notice of Withdrawal of Arg. at 1–2 n.3, ECF No. 27.

whether FHWA acted arbitrarily and capriciously. *See* Def.'s Mot. at 10 ("the agency clearly articulated the rationale for is decision"). Without reviewing the terms of the programmatic agreement, the agency's actions subsequent to termination pursuant to the Section 106 process, and the full administrative record, the Court cannot state definitively whether FHWA's actions conformed with the procedural requirements of the approved programmatic agreement or Section 106. The Court will await motions for summary judgment with citations to the administrative record.[2] *See Vargus v. McHugh*, 87 F. Supp. 3d 298, 301 (D.D.C. 2015) ("When recourse to the record is necessary, a court 'should have before it neither more nor less information than did the agency when it made its decision.'") (quoting *Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)); *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 72 n.16 (D.D.C. 2018) (citing *Boswell*, 749 F.2d at 793); *Swedish American Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 89 (D.D.C. 2010) (denying a motion to dismiss where entire administrative record was not before the court).

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 22, 2020                                                                      RUDOLPH CONTRERAS
                                                                                         United States District Judge

---

[2] Defendant also argues that because a court previously ruled that it did not have jurisdiction to review the termination of the programmatic agreement, this Court should dismiss the Complaint under the doctrine of collateral estoppel. *See* Def.'s Mot. at 11–12. The Court rejects this argument. The previous court dismissed the Tribe's complaint because it found there was no final agency action and thus no waiver of sovereign immunity. *See Narragansett Indian Tribe*, 2017 WL 4011149, at *3. Here, the parties now agree that there has been final agency action, and, therefore, the jurisdictional defect noted before is no longer present. Similarly, the First Circuit dismissed the claims against the federal defendants because nothing in the FHWA waived sovereign immunity for the type of claims alleged in that complaint. *See Narragansett Indian Tribe*, 903 F.3d at 30. Here, to the contrary, the APA provides the requisite waiver of sovereign immunity. *See* 5 U.S.C. § 702.